**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | |
| | : | **CRIMINAL NO. DKC-23-390** |
| **MEHUL RAMESH KHATIWALA,** | : | |
| **Defendant.** | : | |
| | : | |

...oooOooo...

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
FOR REASSIGNMENT OF CASE**

The United States of America, by its counsel, Erek L. Barron, United States Attorney for the District of Maryland, and Martin J. Clarke and Harry M. Gruber, Assistant United States Attorneys for said District, hereby responds to defendant's *Motion to Unrelate the Indictment and Refer to Clerk's Office for Random Assignment* (ECF 79).

### I.   Introduction

As more fully set forth below, there is no basis for the defendant's claim that the Court lacked authority to consider the related case memo that the government had to file with the Clerk of the Court at the time of indictment.   Pursuant to Local Rule 501.1, Title 28 United States Code § 137, and Federal Rule of Criminal Procedure 57, the Court has broad plenary authority to adopt policies to facilitate the judicial assignment of its criminal cases, including requiring the submission of a related case memo to assist the Court's decisional process.   Furthermore, the defendant lacks standing under the Local Rules to contest those administrative decisions.

The defendant's claim that the Court's unwritten related case assignment policy violated his due process rights because it created an appearance of a lack of impartiality is also without merit.   The related case memo was filed in strict accordance with the Court's longstanding policy applicable to the intake and assignment of all related criminal cases, not just the defendant's case.

The memo succinctly summarized in accurate and non-adversarial terms the relationship between the defendant's new case and his prior case so the Clerk's Office and the Court would have sufficient facts to determine whether the Court's related case policy was applicable to the judicial assignment of this case.    In addition, whether a case may ultimately be assigned to the Northern or Southern Division has no bearing on the assignment of a criminal case under the Court's related case policy.

## II.    Procedural History

On November 2, 2023, the defendant and four others were indicted by a grand jury for engaging in a scheme to commit bank fraud.    ECF 1.    Contemporaneous with the grand jury foreperson's presentment of the true bill to the Duty Magistrate, the government provided the Clerk of Court with various documents that must filed at the time of indictment in accordance with this Court's well-established policies.    Those documents included the Indictment, Speedy Trial Form, and related case memo, all of which were needed to properly docket the case, identify related cases, and initiate the judicial assignment process.    ECF 1-10.

The related case memo noted that the current case was "related to the case of *United States v. Mehul Ramesh Khatiwala*, Crim. No. DKC-19-0145," and it briefly explained in four sentences the nature of that relationship:

> Both cases involve the fraudulent application for SBA loans by Khatiwala using straw owners.
>
> In the previous case, Khatiwala pled guilty before Judge Chasanow and was sentenced on April 29, 2021.
>
> At the sentencing hearing, Judge Chasanow ruled that Khatiwala had obstructed justice by concealing from the Court dozens of bank accounts that he had opened and controlled but failed to disclose to U.S. Probation during his pre-sentence interview.

In addition to charging a similar bank fraud scheme for which Khatiwala was previously convicted by the Court, the current case relates to the information Khatiwala allegedly withheld from the Court.

Attachment A.   In keeping with its criminal case assignment policy, this Court assigned the case to Judge Chasanow as a related case in lieu of using the usual random case assignment process. The defendant was subsequently arraigned, and there is a scheduling conference pending.   ECF 51 & 80.

On November 8, 2023, six days after the defendant was indicted, counsel for the defendant emailed the government requesting information about the case assignment process:

> We have another question about the indictment.   Can you advise how the case assignment was determined?   I noticed that Judge Chasanow was assigned to this indictment.   Was this through the Local Rules' random case assignment rule or through some related case notice?   I did not see any indication on the public docket. Thank you.

Government counsel responded by sending a copy of the related case memo that was filed with the Indictment, along with an explanation of the government's understanding of the related case assignment process mandated by the Court.

> Under certain circumstances, the Court requires the government to file with the Clerk at the time of indictment a "related case memo."   While I don't know the origin of this requirement for criminal cases, a similar requirement for civil cases is set forth in Local Rule 103.1b.   It seems the purpose of related case memos is to avoid one judge hearing a matter about which another judge has some previous connection or experience.   According to the civil rule, the idea is to avoid "a substantial duplication of labor."   If a previous case and new case have the same defendant, parties, property, transactions, events, happenings, etc. or "for any other reason", designation of the cases being "related" is required.   As a result, we filed our related case memo at the time of the indictment.   A copy is attached.

> I also don't know exactly what happens after the memos are filed.   It's my understanding that the Assignment Clerk contacts the judge that handled the former matter to get the judge's opinion about whether the two matters are related, and, if so, whether the new case should be assigned to that judge or, if not related, assigned to another judge.   I hope that helps.

On January 4, 2024, the defendant filed the instant motion for reassignment claiming that this Court lacks the authority to consider related case memos in criminal cases and alleging that the related case memo filed by the government in this case created an appearance of a lack of impartiality.   ECF 79 at 5-7, 11.

A. **The Court's Consideration of Related Case Memos in Criminal Cases is Authorized by Statute, Local Rule 501, and the Court's Inherent Authority to Manage Its Docket**

The defendant claims that the Court has no authority to consider a related case memo when making administrative criminal case assignments because there is no written Local Rule specifically addressing the policy.   ECF 79 at 5.   He argues that the Court's only option when assigning a criminal case is to follow its general policy of random case assignment, regardless of whether the new case is related to a prior or pending case.   *Id.*   In short, the defendant claims that the Court lacks the authority to specially assign related criminal cases as it has done for many years.

In support of his argument, the defendant points to the fact that there is a specific written rule, Local Rule 103.1, that sets forth a procedure for the identification of related cases filed in the Civil Division of the Court, but no such Local Rule exists for the filing of cases in the Criminal Division.   *Id.* at 5.   Based on that distinction, he claims the absence of a specific written policy in the criminal context bars the Court from considering related case memos in the assignment of criminal cases.   The defendant's argument is flawed for several reasons.

1. **The Court's Broad Plenary Power to Assign Cases and Manage Its Dockets Pursuant to Local Rule 501, including the Use of Related Case Memos, is Not Limited to Written Policies Set Forth in the Local Rules**

Local Rule 501 sets forth the scope of the Court's authority to decide matters related to case assignments.   Local Rule 501 is located under the section heading "Court Administration . .

4

." and is titled "Assignment of Cases."    Unlike Local Rule 103.1, which is in the "Civil" section of the Local Rules and only pertains to the filing of civil suits and pleadings, Local Rule 501 applies in general to all cases in both the civil and criminal divisions.    The Rule makes clear that the Court has plenary authority to assign a case to any judge in the District.

### RULE 501. ASSIGNMENT OF CASES

**1. In General**

This Rule governs the assignment of cases to <u>judges of the Court and among the two (2) divisions</u> of the Court. It is a <u>rule of administrative convenience,</u> and it is not intended to, nor does it, confer any rights upon any litigant. Notwithstanding the provisions of this Rule, the Court may assign a case to a judge in a division other than the one specified in this Rule.

All cases will be assigned to one (1) of the judges of the Court. With the exception of cases referred to magistrate judges, all proceedings in a particular case will usually be held before the judge to whom that case is assigned.

L.R. 501.1 (emphasis added)

As a "rule of convenience" for assigning cases in both divisions, Local Rule 501.1 provides wide latitude in its execution without any limitation on the form or method to be used.    There is no requirement that the assignment policies of the Court be in writing.    Nor does it bar the use of related case memos during the criminal assignment process to assess whether to specially assign a case to a judge familiar with the matter.    The defendant's motion fails to fully address the significance of Local Rule 501.1 to the assignment of related criminal cases.    The rule's existence is only reluctantly acknowledged in a footnote.    *See* ECF 79 at 9, n.1.

The defendant's argument that the Court lacks the authority to assign this case actually supports the government's interpretation of Local Rule 501 that the unwritten assignment policies of the Court are lawful and enforceable.    His primary argument touts the use of this District's "general" policy of random case assignment as the only authorized approach to the assignment of

criminal cases, even related criminal cases.   ECF 79 at 5.   Thus, he finds no flaw with the Court's random assignment policy.    Yet, the random assignment policy he wants applied in every criminal case regardless of relatedness is itself an <u>unwritten</u> one, just like the Court's <u>unwritten</u> related case memo policy for the assignment of criminal cases.    Neither one has been specifically codified in the Local Rules.    Nonetheless, as the defendant's argument concedes, the random assignment policy is an example of a longstanding unwritten policy of the Court, one that the Clerk of the Court and all parties must follow, and have followed, for decades.

In sum, under the Local Rules, whether an assignment policy is written or unwritten does not determine the Court's authority to adopt and enforce it.   Hence, the plain language of Local Rule 501.1 gives the Court plenary authority to consider related case memos at the time of indictment to help the Clerk identify whether the case is related to a previously docketed case.

### 2.    The Defendant Lacks Standing under Local Rule 501.1 to Directly Challenge the Assignment of His Criminal Case

The broad authority afforded the Court under Local Rule 501.1 in no way limits its discretion to assign criminal cases as it sees fit.   However, the Rule does expressly limit a defendant's right to challenge a criminal case assignment.[1]   It explicitly states that the regulation of case assignments under Local Rule 501.1 "is a rule of administrative convenience, and it is not intended to, nor does it, confer any rights upon any litigant."[2]   *Id*.   Thus, under the plain language of the Rule, a defendant has no standing under the Local Rules to challenge this Court's decision to view his current case as "related" to a previous case.   While the defendant does not have standing under Rule 501.1 to directly challenge the decision to assign a related criminal case

---

[1]    Litigants lack standing under L.R 501.1 to challenge the assignment of other types of cases as well, including state removal cases, habeas corpus cases, and prisoner civil rights cases.

[2]    As noted above, Local Rule 501.1 applies to criminal cases.

under the Local Rules, the defendant would still have standing to challenge the assignment on other grounds, such as judicial bias or prosecutorial misconduct, neither of which are alleged here.

### 3.   28 U.S.C. § 137 and Fed. R. Crim. P. 57(b) Affirm the Court's Broad Authority Under Local Rule 501.1 to Assign Criminal Cases

The Court's broad discretion to use related case memos in the assignment of criminal cases under Local Rule 501.1 finds statutory support in 28 U.S.C. § 137, which is titled "Division of business among district judges."

> (a)   In General. —
> The business of a court having more than one judge <u>shall be divided among the judges as provided by the rules and orders of the court</u>.
> The chief judge of the district court shall be responsible for the observance of such rules and orders, and <u>shall divide the business and assign the cases so far as such rules and orders do not otherwise prescribe</u>.

28 U.S.C. § 137 (emphasis added).   The statute makes clear that the Court is not bound by any particular case assignment procedure; there is no difference between written and unwritten local rules and orders when it comes to managing the Court's business; and the authority to assign cases not otherwise regulated by local rules and orders is left to the discretion of the Chief Judge.   In short, how the Court organizes its criminal case assignments should not be open for debate if and when a defendant does not like the outcome.

The broad authority afforded the Court by Local Rule 501.1 also finds support under Federal Rule of Criminal Procedure 57.   Rule 57 provides the Court with a great deal of discretion in how it "make[s] and amends rules governing its practice," with the caveat that those rules must be consistent with federal statutes and the Supreme Court's rules and procedures.   Fed. R. Crim. P. 57(a)(1).   Indeed, whenever there is "no controlling law" governing a district court's practice, a "judge may regulate [its] practice in <u>any manner</u> consistent with federal law, these rules, and the local rules of the district."   Fed. R. Crim. P. 57(b) (emphasis added).

Courts have consistently applied 28 U.S.C. § 137 and FRCP 57 to support the wide discretion that district judges have to manage case assignments.   For example, in *United States v. Diaz*, 189 F.3d 1239 (10th Cir. 1999), approximately a month after the defendant was arrested, the district court adopted a new policy of assigning cases.   *Id.* at 1243 (citations omitted).   Under the new policy, a different judge within the district was assigned to hear cases each month, and sometimes out-of-district judges sat by rotation, which meant six different judges presided over Diaz's case throughout the case's progression to sentencing.   Diaz argued that the rotating assignment system was invalid "in the absence of a written policy or order."   *Id.* at 1244.

Relying on 28 U.S.C. § 137 and FRCP Rule 57, the Tenth Circuit upheld the district court's reliance on its unwritten assignment policy.   The Tenth Circuit explicitly wrote about court's inherent authority to administer its caseload, writing:

> In light of this discretion in managing court business, we agree with the Fifth Circuit that: "[d]istrict judges may by *rule, order or consent* transfer cases between themselves.... Each judge of a multi-district court has the same power and authority as each other judge.... Moreover, the District Judges have the inherent power to transfer cases from one to another for the expeditious administration of justice."

*Id.* at 1244 (citing *United States v. Martinez*, 686 F.2d 334, 338 (5th Cir.1982)) (citations omitted) (emphasis in original).   The Court noted that district judges had regular meetings where the balancing of assignments, judicial efficiency, and rotating cases were discussed among themselves and case managers.   The unwritten transfer and reassignment policies that developed as a result were valid and within the district judges' broad authority.   Furthermore, the Diaz Court held that the defendant did not have standing to challenge the validity of the Court's decision that the policy furthered judicial efficiency, writing, "With all respect, *the judges need to be the ones that make that call.*"   *Id.* (emphasis added); *see also United States v. Pearson*, 203 F.3d 1243, 1256 (10th

Cir. 2000) (citing cases holding a defendant does not have a right to a particular judge, nor a particular process for the selection of a judge, including random draw).

Finally, the Supreme Court has held that the district court's power to manage its affairs is not fully encompassed in the federal rules. *See Dietz v. Bouldin*, 579 U.S. 40, 45-46 (2016). The Court gives the example of the district court's inherent authority to hear motions in limine, which has no authorizing provision in the federal rules. *Id*. at 45. And there are "many other standard procedural devices [that] trial courts around the country use every day . . ." that are not codified in a rule. *Id*.

> Accordingly, this Court has long recognized that a district court possesses inherent powers that are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

579 U.S. at 45 (citations omitted).

In sum, for all the foregoing reasons, this Court had the authority to adopt and enforce its unwritten policy for the assignment of related criminal cases under Local Rule 501.1, and the defendant lacks standing to contest that administrative decision.

### B. The Defendant's Due Process Rights Were Not Violated by the Government's Strict Adherence to the Court's Mandatory Policy of Submitting Related Case Memos in Criminal Cases

#### 1. The Submission of the Related Case Memo at the Time of Indictment in Accordance with the Court's Policy Did Not Create an "Appearance of Lack of Impartiality"

The defendant's motion does not allege that the Court or the government engaged in any improper conduct during the intake and assignment of his case, nor is there any evidence to suggest otherwise. To the contrary, the facts establish that the government followed the Clerk's established procedure for compliance with the Court's mandatory policy requiring the filing of a related case memo at the time of indictment.

However, the defendant argues that the "confluence of circumstances" surrounding the government's filing of the memo, *i.e.*, he alleges the memo was filed "unsolicited" under a policy the Court had no authority to adopt, created the "appearance of lack of impartiality" that he likens to "judge-shopping."   ECT 79 at 9-10.   Stated differently, according to the defendant, the mere filing of the related case memo in any case means the government "select[s] the judge," not the Court.   *Id*. at 9.   Here, the insinuation ignores the fact that the government followed the Court's mandatory assignment policy by providing a very short memo that reasonably apprised the Clerk in non-adversarial terms about the relationship between the defendant's current case and the prior case he had before Judge Chasanow.

As part of its training outreach, the Court regularly shares its policies and procedures with the organizations and government agencies that appear before it, including the Federal Bar Association, the Office of the Federal Public Defender, the Office of the United States Attorney (USAO), etc.   To that end, representatives from the Clerk's Office will occasionally give presentations about how to comply with the Court's policies, including what documents have to be filed at the time of indictment.

As recently as May 2023, the Clerk's Office gave a presentation at the USAO, which included a discussion about the need to file a "Related Case Memorandum" along with other necessary "charging documents" by the "time the GF [Grand Jury] returns the Indictments."   Best Practices for United States Attorneys, May 2023.   The purpose of the Memorandum is "to advise of any cases that are pending so the judge can determine whether they can accept the assignment," which includes searching CM/ECF for existing cases for the defendant and cases for which the defendant is on supervised release.   *Id*.

The Court's policy on related case memos in criminal cases is incorporated into the USAO

Office Policy Manual (OPM).

> Whenever a criminal case is filed which is in some way related to another, the AUSA responsible for the case should prepare a short memorandum addressed to the Clerk's Office . . . setting forth the facts and circumstances which connect the cases to one another. The purpose of the memorandum is to alert the Court to the relationship in the event that the Court wants to assign the cases to the same Judge . . .
>
> Upon receipt of the memorandum, the Clerk's Office will contact the Judge in question to determine whether or not he or she will accept the case. Until we have been advised by the Clerk's Office that the case in fact has been assigned to that Judge, we should not, absent unusual circumstances, contact the Judge's chambers . . .
>
> Under no circumstances, either in a related case memo itself or in response to an inquiry from the Clerk's Office, should we make any recommendation as to whether or not the cases should be assigned to the same judge. Our role is limited to bringing the relevant facts and circumstances to the Court's attention.

OPM at 128.   Here, consistent with the Court's policy, the government made the requisite filing

in a non-adversarial way without advocating how the Court should make the assignment.

### 2.     The Related Case Memo Fairly and Accurately Summarized the Relationship between the Defendant's Two Cases

The defendant's due process claim finds no fault with the wording of the related case

memo, only the ultimate finding that the cases are in fact related.   *See* ECF 79 at 11-16.   Each of

the memo's four sentences about this Court's handling of the defendant's prior case is objectively

accurate: the Court presided over the defendant's prior bank fraud case, which involved a similar

scheme, and, after a sentencing hearing, made a ruling that the defendant obstructed justice by

withholding information, much of which is now charged in the current case.   *See* Attachment A.

In other words, the memo served its mandatory apprisal function under the Court's assignment

policy to put the Clerk's Office on notice that a related case existed and to provide the bare

minimum facts to refresh the Court's memory so the Court could make its administrative assignment decision.

Nevertheless, the defendant seeks to challenge the Court's decision on due process grounds.   In support of that claim, the defendant provides string citations with quotes to inapposite cases that either discuss general due process principles or blatant examples of case assignment manipulations that resulted in motions to recuse judges and prosecutors.   *See* ECF 79 at 3-4, 6; *see, e.g.*, *Grutter v. Bollinger*, 16 F. Supp. 2d 797, 800 (E.D. Mich. 1998) (Chief Judge recused herself because her husband was a defendant in both lawsuits, but rather than randomly reassigning the cases, steered them to two judges she personally selected); *United States v. Montecalvo*, 533 F.2d 1110, 1112-13 (9th Cir. 1976) (the judge who read the defendant's presentence report before rendering verdict should not have been assigned to the case); *Marshall v. Jericho,* 446 U.S. 238, 242-43 (1980) (*citing Tumey v. Ohio*, 273 U.S. 510, 532 (1927) (trial judge who also was the town mayor had a financial incentive to assign cases to himself to fund his salary).[3]   None of the cases cited by the defendant support the defendant's argument that the Court's decision here created an appearance of a lack of impartiality that violated his due process rights.

Finding no due process case on point, the defendant nonetheless claims standing to ask the Court to reconsider its decision and have the new case randomly reassigned because the defendant's two cases are unrelated as a matter of fact.   *See* ECF 79 at 12-16. Although no

---

[3]     The defendant also seems to be asking the Court to rely on his view of current events to avoid a due process violation, stating that "our criminal justice system is under continuing attack by high-profile litigants and media alike . . . [and if the Court] fails to reconsider its related case policy in favor of random assignment in all criminal cases, the Court "would add unnecessary timber to the fearmongering fires stoked by those who seek to incite distrust in our constitutional system."   ECF 79 at 11.

particular threshold is required to find relatedness in criminal cases under Rule 501.1, the defendant nevertheless argues that the Court is bound by the factors set forth in civil Local Rule 103.1(b).

By any standard, the facts and circumstances of this case are related to those addressed by the Court in *United States v. Khatiwala*, DKC-19-0145.

> **i.** **The new case arises from the same or identical transactions, happenings, or events**

The investigation and indictment of the new case is intertwined with the transactions, happenings, and events in the prior case.   Throughout the time this Court handled the defendant's prior case, including his guilty plea, sentencing, and supervised release, the defendant was committing the offenses alleged in this case.   In other words, in between his guilty plea and sentencing before Judge Chasanow in the prior case, he was actively committing the $35 million crime spree charged in the current Indictment – while under this Court's pretrial supervision. Indeed, the defendant was literally in the midst of defrauding banks during the Court's presentence investigation in the prior case.

For example, eight days after the defendant was charged by Criminal Information in the prior case, the defendant used the pretense of a false $825,000 investment in his wife's name to fraudulently secure an SBA loan from a bank in the amount of $4.86 million to buy a Motel 6 on March 29, 2019.   *See* ECF 1 at 24-25 (Count Eleven).   On June 7, 2019, just three days after U.S. Probation ("USPO") completed the defendant's Presentence Investigation Report, the defendant fraudulently used the straw owner of one of his shell companies to close the sale and purchase of a Comfort Inn using $4.15 million in fraudulently obtained SBA financing.   *See* ECF 1 at 27 (Count Thirteen).   Over the eight months after his guilty before this Court on April 25, 2019, while regularly reporting to his Pretrial Services' supervising officer during that period, the

13

defendant organized others to help him fraudulently obtain approximately $14 million in SBA loan proceeds to purchase four hotels in four different states.   ECF 1 at 27-29, 32-33, 38-39, 41-42 (Counts Fourteen, Seventeen, Twenty-One, and Twenty-Three, respectively)

It is not just the timing of the "transactions, happenings and events" that make the cases related, it also the similarity of the charged criminal acts/transactions in each case during their respective conspiratorial periods.   The defendant employed the same schemes to defraud in both cases, which included the fraudulent use of straw owners to conceal true ownership interests in the sale and purchase of hotels.

One of the ways he executed both schemes was by using fraudulent Operating Agreements for the LLCs involved.   Both cases targeted the Small Business Administration (SBA).   Two of the three fraudulently obtained properties in the prior case were hotels involving SBA loans.   All the properties charged in the new case are hotels with SBA loans.

Prior Case (4-1-19 guilty plea):

Memphis Airport Hotel, Memphis, TN, February 2012: The defendant provided a *false Operating Agreement* to the bank reflecting that he was the 100 percent owner of the borrowing entity in order to hide his business partner's ownership interest from the bank. *See* Statement of Facts, Case No. 19-0145, ECF 8-1 at 9-10.

Best Western Hotel, York, PA September 2011:   The defendant provided a *fraudulent Assignment of Interest and Operating Agreement* to conceal the ownership interest of a family member in the selling entity.   *Id*. at 10-12.

Condominium Project, Perryville, MD 2011-2014: The defendant created *fraudulent Operating Agreements* for the same borrowing entity, submitted a false promissory note at settlement, and provided false personal financial statements to the bank that falsely listed the entity's ownership interests.

New Case (indicted 11-2-23):

Ten Hotel Purchases in Five States: The defendant used shell companies, straw owners, and false documents to conceal his ownership interest and the interests of others in the entities buying and selling hotels.   *See* ECF 1, Case No. 23-0390 at 6-9.   To support the

14

misrepresentations in the buying entities, he provided the banks with *Operating Agreements* reflecting ownership interests supported by false equity injections and other bogus documents for the following entities that are <u>named in the Indictment</u>: **Bmore Hotels; CT Hotels; Fairview Hotels; Jamestown Hotel; JC Hotels;    River    City; SNY Hospitality; Springpike; and Steel City**. *Id*. at 13-42.

The Court relied upon the evidence about the foregoing entities' false operating agreements and hidden bank accounts during the sentencing hearing in the prior case.

| Business Holdings Mehul Khatiwala | | | | | |
|---|---|---|---|---|---|
| Company Name | Operating Agreement Interest | Operating Agreement Date | Certification of Beneficial Owner ≥ 25% | Certification of Beneficial Owner - Date | Exhibit # |
| Bmore Hotels LLC | 80% | 11/3/18 | Yes | 11/26/18 | 7 b,c |
| Cedar Creek Hotels LLC | 50% | 10/13/17 | Yes | 8/19/19 | 8 b,c |
| CHNJ Hospitality LLC | 50% | 5/22/17 | Yes | 10/22/20 | 9 b,c |
| CT Hotels LLC | 85% | 9/10/18 | Yes | 10/5/18 | 10 b,c |
| Fairview Hotels LLC | 60% | 3/13/19 | Yes | 4/10/19 | 11 b,c |
| Jamestown Hotel LLC | 80% | 11/6/18 | Yes | 11/13/18 | 12 b,c |
| JC Hotels LLC | 60% | 3/13/19 | Yes | 4/10/19 | 13 b,c |
| KPG Hotel Mgmt LLC | 100% | NA | NA | NA | 14 b |
| River City Hotels LLC | 60% | 9/27/18 | Yes | 1/22/19 | 15 b,c |
| Sharvari LLC | 25% | NA | NA | NA | 16 b |
| SNY Hospitality LLC | 75% | 6/22/18 | Yes | 6/27/18 | 17 b,c |
| Springpike Hotels LLC | 60% | 12/5/18 | Yes | 4/10/19 | 18 b,c |
| Star Sky Hotels LLC | 85% | 8/30/18 | Yes | 10/5/18 | 19 b,c |
| Steel City Hotels LLC | 60% | 3/13/19 | Yes | 4/16/19 | 20 b,c |
| WLS Hotels LLC | 48% | 5/15/17 | NA | NA | 21 b |
| BNI Management Inc. | 30% | 6/18/18 | Yes | 12/20/19 | 22 a,b |
| JSK Lakes LLC | 25% | 2/11/19 | Yes | 9/10/19 | 23 a,b |

ECF 48, Case No. 19-0145, at 11 Figure 7.    In short, to establish the defendant's ongoing modus operandi from 2014 to 2019, nine of the seventeen entities presented to the Court in the prior case were used by the defendant to commit the fraudulent transactions in this case.    They are specifically named in each of the counts of the Indictment.    *See* ECF 1, Case No. 23-0390 at 13-42.

The defendant also played a large role in brokering the deals and loans in both cases, primarily through his hotel management company, Delaware Hotel Group (DHG).    For example, in the prior case, under DHG, the defendant assembled financial records and coordinated purchase agreements on behalf of investors, including members of his family, particularly for the purchase of the Best Western Hotel.    Similarly, in the new case, the defendant compiled virtually all the necessary loan application and settlement documents under DHG or GMK Consulting, another hotel brokering business he owned.    *See* ECF 1, Case No. 23-0390 at 1.

Both cases also involved the use of false equity injections by the purported owners of the buying entities.    For example, in the prior case, the defendant filed a false Verification of Deposit that falsely overstated the amount of funds in a borrower's bank account by $2.2 million.    In the new case, the defendant orchestrated the submission of false equity injections in every transaction charged in the Indictment.

### ii.    The Case Involves Identical Parties or Property

Regarding the similarities between the parties or property in each case, Mehul Khatiwala was a defendant in both cases, and the SBA and other banks were targets of his schemes in both cases.    As previously discussed, the nine limited liability companies the defendant concealed from the Court at the sentencing hearing in the prior case were used to commit the scheme charged in the new case.

Furthermore, some of the defendant's relatives benefited from the schemes in both case as noted below.

<u>Prior Case</u>:

The defendant's sister-in-law, **Kamal Khatiwala**, was an owner in the selling entity while her husband, **Jayesh Khatiwala**, the defendant's brother-in-law, was an owner in the buying entity.    When the bank noticed the familial conflict of interest, the defendant filed a fraudulent Assignment of Interest falsely stating that Kamal Khatiwala had sold her

16

interest in the selling entity.   The defendant's sister, **Neela Trivedi**, also had an interest in the selling entity under **Trivedi Enterprises**.   The selling entity ultimately benefited from a discounted payoff that Khatiwala obtained by providing the bank with fraudulent information.

New Case:

The defendant arranged for **Kamal Khatiwala** and **Trivedi Enterprises** to obtain ownership interests in hotels by using false equity injections.   And **Jayesh Khatiwala** purportedly obtained a small ownership interest in a hotel through a $132,000 bank withdraw that was not part of the settlement record.   The defendant's wife also obtained hotel ownership interests using false equity injections.

### iii.   Any other Reason that would Entail a Substantial Duplication of Labor if Heard by Different Judges

The foregoing facts and circumstances show that the defendant's two cases are related. There are substantial similarities between the schemes employed, the nature of the specific transactions, and the events surrounding the execution of the schemes.   The defendant manipulated what happened at the loan closings in each case.   He arranged the ownership shares and the bogus documents leading up to the loan settlements to deceive bank underwriters, primarily through false equity injections and straw owners listed in fraudulent Operating Agreements.

As previously noted, the defendant does not have standing to contest the Court's administrative assignment of his criminal case, and the Court has wide latitude to decide whether the cases are "related" under Local Rule 501.1.   However, the defendant argues that, to be related, the cases have to be the "same" in the sense that everything has to be "identical," which would mean that the two cases would practically have to be mirror images of each other.   In other words, they would have to be the exact "same" case whose existence was the result of two different filings.

By any standard, that is an unreasonable interpretation of what constitutes relatedness, including the standard used for determining related cases in civil docketing under Local Rule 103.1.   That rule is completely written in the disjunctive.   Not only would any one of the four

factors be sufficient for the Court to find relatedness, but any one of the terms within each of the four factors would be sufficient.    For example, the first factor pertains to the similarity between "transactions, happenings, or events." L.R. 103.1(b)(i) (emphasis added).    And the same for the second factor which allows similarities between "parties *or* property."    *Id.*

Not only are those factors present here, but also the fourth factor, which relates to "any other reason" why the assignment of the new case to a judge other than the one who presided over the prior case would "entail a substantial duplication of labor."    *Id.*    Here, Judge Chasanow became very familiar with the defendant's modus operandi and his manipulation of financial and real estate records in both cases.    However, neither Judge Chasanow nor the government fully understood the significance of the defendant's obstructive conduct at the time of his sentencing in the prior case.    Yet, after the multi-hour hearing, it became clear to everyone, including the judge, that there were substantial similarities between the types of documents he used to commit the prior offense in 2014 and the bank accounts and business records he chose to conceal from the Court at his sentencing in 2019.[4]    As noted, most of those documents and entities form the basis of the current Indictment.

The defendant's conduct before this Court entwined the two cases.    By the defendant's actions, evidence related to his post-plea crime spree and the LLCs he used to commit it was front and center at his sentencing hearing in the prior case.    At the time, neither the government nor

---

[4]    The Court recognized those factual similarities: "And the defense asks me to take their word for it, that nothing that went on with regard to those other LLCs and operating agreements and transactions affect the net worth statement that appears in the presentence report. I reject that assertion . . . The government seeks a variance . . . [r]eferring to the pattern of financial shenanigans, frankly, that continue with regard to the LLCs, the operating agreements, the relationship with banks, I don't -- I don't disagree that there is plenty of smoke there, but I am not prepared in this proceeding to find that that activity elevated to the fraud level of the count of conviction."    ECF 78 Case No. 19-0145 at 88, 92.

the Court fully understood the scope of the new crimes he had been committing while under the Court's supervision.   The simultaneousness of those events and the Court's close proximity to it all makes it difficult to see how one case can be segregated from the other.   Asking another judge to get up to speed with both cases would "entail a substantial duplication of labor."   *Id*.

In sum, by any reasonable standard, the defendant's two cases are related under the Court's assignment policy for criminal cases.

### C.   Assigning the Case to a Judge Who Presides Over Cases in Both the Northern and Southern Divisions Did Not Violate the Defendant's Due Process Rights

Straining to find a fact to bolster his due process claim, the defendant claims that assigning the case to a judge "sitting" in the Southern Division instead of the Northern Division also creates an "appearance of lack of impartiality" because it runs "afoul" of Local Rule 501.4.   ECF 79 at 7-9.   That Rule lists various factors by which the Court chooses the Division that best suits the convenience of the parties based on where they reside.   The defendant's claim misconstrues the facts, as well as the Court's inherent discretion to assign related cases as previously discussed.

First, the facts show that the case was properly docketed in the Northern Division.   The defendant was indicted by a grand jury sitting in the Northern Division, and the charging documents filed by the government identified the case as a Northern Division case. Consequently, nothing about the filing of this case suggests any attempt by any party to have it heard in the Southern Division.

Second, the premise of the defendant's claim is erroneous.   It does not take into account that the assignment, whether to the Northern or Southern Division, involved a related case that was exempted from the random assignment process for all the reasons previously discussed, including the Court's broad discretion under Local Rule 501.1, 28 U.S.C. §137, and Fed. R. Crim. P. 57. Hence, a determination that a particular judge presided over a prior related case and would be best

19

positioned to hear the new case means, by definition, that the new case has to be assigned to and follow the judge who presided over the prior related case notwithstanding any geographic limitation.   Neither Local Rule 501.1 nor 501.4 preclude a related case from being heard in either Division.

Finally, it is the government's understanding that over the last couple of years Judge Chasanow has been both figuratively and literally "sitting" in both the Northern and Southern Divisions.   In other words, for various administrative reasons, it is the government's understanding that Judge Chasanow has been assigned and accepted a significant number of Northern Division cases and presides over many of them at the Northern Division courthouse in Baltimore.   So, the fact that historically she has primarily held a Southern Division docket should not be a bar to accepting related case assignments in the Northern Division.   Furthermore, the defendant makes no claim that Judge Chasanow has a bias or prejudice against the defendant or the case generally that would impede her ability to preside over it fairly and effectively.   In sum, there is no merit to the defendant's argument that assigning the case to Judge Chasanow violated the defendant's due process rights.

**D.     Conclusion**

For all the foregoing reasons, the motion should be denied.   Based on the nature of the defendant's claim and the parties' memoranda, the government does not believe that a hearing is necessary under Local Rule 105.6.

_____

Respectfully submitted,

Erek L. Barron
United States Attorney

By:_____/s/_____
Martin Clarke
Harry Gruber
Assistant United States Attorneys

Office of the United States Attorney
District of Maryland
(410) 209-4840

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 31st day of January 2024, a copy of the foregoing

*Government's Response to Defendant's Motion to Unrelate the Indictment and Refer to Clerk's*

*Office for Random Assignment* was electronically filed and made available to counsel of record.

Digitally signed by
MARTIN CLARKE
Date: 2024.01.31 09:06:21
-05'00'

_____

Martin J. Clarke
Assistant United States Attorney